IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Civil Action No._____

| | | |
|---|---|---|
| UNITED STATES ex rel | : | |
| | : | |
| **UNDER SEAL,** | : | |
| | : | |
| | : | |
| BRINGING THIS ACTION ON BEHALF | : | |
| OF THE UNITED STATES | : | |
| OF AMERICA | : | Complaint Filed **IN CAMERA SEALED,** |
| | : | Pursuant to 31 U.S.C. § 3730(b) |
| W. Stephen Muldrow | : | |
| U.S. Attorney | : | |
| Middle District of Florida | : | |
| 400 North Tampa Street | : | |
| Suite 3200 | : | |
| Tampa, Florida 33602 | : | |
| | : | |
| and | : | |
| | : | United States District Court |
| Jeff Sessions | : | Judge |
| Attorney General of the United States | : | |
| U.S. Department of Justice | : | |
| 950 Pennsylvania Avenue, NW | : | |
| Washington, D.C. 20530 | : | |
| | : | |
| Plaintiff and Relator, | : | **FALSE CLAIMS ACT COMPLAINT** |
| | : | **AND JURY DEMAND** |
| vs. | : | |
| | : | |
| **UNDER SEAL** | : | **DO NOT PLACE IN PRESS BOX** |
| | : | **DO NOT ENTER ON PACER** |
| Defendant. | : | |

**FALSE CLAIMS ACT COMPLAINT**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Civil Action No._____

UNITED STATES ex rel
BOYDE JERRY HARRISON

v.                                                    **Complaint Filed IN CAMERA SEALED,**
                                                      **Pursuant to 31 U.S.C. § 3730(b)**

CARESYNC, INC.,
           Defendant.

## COMPLAINT

COMES NOW Relator, Dr. Boyde Jerry Harrison, on behalf of himself and the United States of America and alleges as follows:

### INTRODUCTION

1. Relator brings this action on behalf of himself and the United States of America to recover statutory damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33.

2. These claims are based upon Defendant's submission and causing the submission of false and fraudulent claims for payment to the United States, and its fiscal intermediaries, in order to obtain millions of dollars in payments from Medicare from 2015 to the present. Defendants also created false records or statements to support a false claim for payment. As more specifically alleged below, Defendant engaged in false and fraudulent behavior in connection with the chronic care management of the Relator's Medicare patients. As a result, Defendant submitted or caused to be submitted false claims to Medicare for services in violation of the False Claims Act and created false records or statements in support of false claims for payment.

1

3. Relator has complied with the requirement of the False Claims Act to provide all of his material evidence to the United States prior to filing suit.

4. Relator is serving the U.S. Attorney for the Middle District of Florida and the United States Attorney General with a copy of this Complaint filed under seal.

## JURISDICTION AND VENUE

5. This action arises under the False Claims Act, as amended, 31 U.S.C. §§3729-33. This Court has jurisdiction over this action under 31 U.S.C. §3730 and 28 U.S.C. §§ 1345 and 1367 (a).

6. The Court has personal jurisdiction over the Defendant, because they can be found in, are authorized to transact business in, and are transacting business in the Middle District of Florida and because Defendant committed acts within this district and division that violated 31 U.S.C. §3729 et seq.

## PARTIES

7. Relator, Boyde Jerry Harrison ("Relator Harrison") is a citizen of Haleyville, Alabama and the United States of America. Relator Harrison graduated from Birmingham Southern University in 1974 with a Bachelor of Science in Chemistry. In 1980, Relator Harrison graduated from UAB School of Medicine and went on to complete his internship and residency at Georgia Baptist Medical Center. In 1981, Relator opened Boyde J. Harrison, M.D., P.C. Family Practice in Haleyville, Alabama.

8. Relator became aware of the fraudulent activity discussed herein because he was a client of Defendant CareSync. Relator Harrison signed up with CareSync in December 2015 for their chronic care management service. Relator Harrison and his staff saw and discovered firsthand the lack of care CareSync provided to their patients and their disregard for Medicare's regulation

of chronic care management billed under CPT Code 99490.

9. As a result of Caresync's fraudulent behavior and lack of patient care, Relator Harrison terminated his contractual relationship with Caresync on November 28, 2016.

10. Defendant CareSync, Inc. ("CareSync") is a chronic care management company touts itself as helping physician offices maintain Medicare's requirement for Chronic Care Management (CPT code 99490). CareSync collects, organizes, and stores patient health information in a comprehensive database. CareSync should provide a clinical team that performs the monthly services required by Code 99490 to provide comprehensive care. This comprehensive database and care management should be assisting physicians in managing chronic care patients as required by Medicare under CPT Code 99490. However, this has not been Relator Harrison's experience with Caresync.

11. Defendant CareSync is headquartered in Tampa, Florida, but they have sales representatives all over the country. CareSync is located at 14055 Riveredge Drive, Suite 600, Tampa, Florida 33637.

12. Relator Harrison believes that CareSync has a contract with MediSys, who is a large medical billing service in the state of Alabama. Relator also believes that the fraudulent conduct he experienced by CareSync is happening all over the country because all of the coordination of care calls, and documentation of care, are being made from the central office in Tampa, Florida.

## The Law

13. Except as specifically noted in the Complaint, the allegations herein apply to the time period of 2015 through the present.

**The False Claims Act**

14. The False Claims Act provides in pertinent part that:

3

(a) any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

\* \* \* \*

is liable to the United States Government for a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410), plus three times the amount of damages which the Government sustains because of the act of that person. (b) For purposes of this section(1) the terms "knowing" and "knowingly" (A) means that a person, with respect to information (i) has actual knowledge of the information; (ii) acts and deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information; and, (B) require no proof of specific intent to defraud; (2) the term "claim" (A) means any request or demand, whether under contract or otherwise, for money or property and whether or not the United States has title to the money or property that (i) is presented to an officer, employee or agent of the United States, or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested and demanded and (3) the term "obligation" means an established duty, whether or not fixed, arising from an expressed or implied contractual, grantee-grantor, or license-licensee relationship, from a fee-based or similar relationship, from a statute or regulation, or from the retention of any over-payment; and (4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. §3729

**Federal Healthcare Programs**

15. The federal program financially harmed by Defendant's wrongful conduct is Medicare. Defendant submitted claims to and received money from this federal program.

    ***A. The Medicare Program***

16.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq., establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Secretary of HHS administers the Medicare Program through CMS, a component of HHS.

17.     The Medicare program consists of two parts. Medicare Part A provides basic insurance for the costs of hospitalization and post hospitalization care. 42 U.S.C. §1395c 1395i 2 (1992).

18.     Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage (typically eighty percent) of the fee schedule amount for physician, laboratory and diagnostic services. 42 U.S.C. §§ 1395k, 13951, 1395x(s). Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance carriers, known as fiscal intermediaries, to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395u.

19.     As a condition of payment, Defendant was required to expressly or impliedly certify compliance with Medicare laws and regulations.

20.     At all times relevant to the complaint, the Medicare program constituted a substantial source of revenue for the Defendant.

### The Fraudulent Schemes and False Claims for Payment

21.     In December 2015, Relator Harrison signed a Chronic Care Management Services Agreement with CareSync. Relator Harrison signed up through a billing consultant out of Texas, Don Self, while he was attending the American Medical Directors Association meeting in Orlando, Florida.

22.     The CareSync Agreement stated that CareSync would "provide chronic care management and care coordination services for and on behalf of physicians and physician groups, in accordance with the Centers for Medicare and Medicaid Services 2015 Physician Fee Schedule."

23. The Agreement also stated that CareSync agrees to "document accurately and truthfully for reimbursement for all services provided by [CareSync] to support the proper billing for the services provided by Physician using CPT Code 99490 or such other appropriate CPT Code" and that Caresync will "comply with all federal and State laws and regulations relating to the Services, including compliance with the CMS Chronic Care Management Regulations, all self-referral, fraud, and abuse laws, the HIPAA Rules and HITECH Act, and State privacy laws."

24. Because CareSync's continued material breach of the Agreement in regards to the services that they were engaged to provide, Relator Harrison terminated his contract with CareSync on November 28, 2016.

25. As of January 1, 2015, Medicare began reimbursing for Chronic Care Management. This reimbursement is billed under CPT Code 99490.

26. The CMS Final Rule, from October 31, 2014, sets out the following: "Chronic care management services, at least 20 minutes of clinical staff time directed by a physician or other qualified health care professional, per calendar month, with the following required elements: multiple (two or more) chronic conditions expected to last at least 12 months, or until the death of the patient; chronic conditions place the patient at significant risk of death, acute exacerbation/decompensation, or functional decline; comprehensive care plan established, implemented, revised, or monitored."

27. The Chronic Care Management Service should include a structured recording of patient health information, comprehensive care plan that addresses all the patient's health care needs, access to care management services, managing care transitions, and coordinating and sharing of patient information with practitioners and providers outside of the practice.

28. CPT Code 99490 requires that the billing practitioner continue work to maintain the

patient's chronic care, as well. This can be anything from supervision, ongoing oversight, direction and management of the chronic care management by CareSync and patient visits with the physician. Relator Harrison fulfilled his duty as the billing practitioner by continuing to see the enrolled patients in his office and maintaining the patients' check-up appointments.

29.     Medicare requires that new patients or patients that have not been seen by the billing practitioner within a year of the commencement of Chronic Care Management Services (CPT Code 99490) to go through an initiating visit with their physician. At Relator Harrison's office, the process for signing patients up with CareSync began by Relator Harrison informing qualifying patients in his office about CareSync and their services. Relator Harrison would get each patient signed up and Jean Bacu, Relator Harrison's clerk, would get the patient's information logged in to the CareSync database.

30.     Once they were enrolled, each patient would sign a Chronic Care Consent and receive an introduction booklet provided by CareSync. This introduction booklet provides information regarding what the physician and the patient can expect from CareSync and their care management plan.

31.     Based on the information provided in the sales pitch and marketing materials, including the introduction booklet provided for patients, Relator Harrison believed that CareSync would call patients monthly, according to the requirements listed for CPT Code 99490, to manage their chronic care and update the CareSync database (e.g. whether the patient is on any medication; is the medication new; is the patient making it to their doctor's appointments; how is the patient's blood sugar, etc.).

32.     By contacting patients each month, Relator Harrison expected that the minimum twenty minute phone conversation between CareSync and the patient would go through each patient's

comprehensive care plan individually and update the database with any new information. It was also expected that CareSync would provide continuity of care by working with the patient to get appointments scheduled and medications updated.

33. CareSync signs up the billing practitioner, usually the primary care physician, and uploads all the patients' information into the database. This allows each of the patients' physicians to access the comprehensive care plan.

34. This comprehensive care plan can provide a multitude of information about the patient and their care, including but not limited to: symptom and medication management, treatment goals, interventions that are planned and the individual who is responsible for each intervention and a schedule for the revision of the care plan.

35. The accessibility of the comprehensive care plan to all physicians that work together with each patient was a leading motivator in Relator Harrison's decision to use CareSync. Without the database of patient information and continuous updates to the patient's care plan, Relator Harrison's staff had to contact the patient's other physicians to get information each time the patient came in for a visit. This can be a long process and is not easily completed while the patient is waiting. With CareSync, the database was supposed to hold all of the patient's care information and allow all treating physicians could view that patient's information and care plan for more effective patient care.

36. This comprehensive care plan should have eliminated the need for each physician to contact the patient's other physicians to get information about their recent appointments and updates on medications prescribed, thus, providing a comprehensive care plan for the patient at each physician's fingertips. However, CareSync was not providing this type of care management for Relator Harrison's patients.

37. According to their sales pitch and marketing materials, CareSync would contact each patient monthly to discuss their care management because the CPT Code 99490 requires at least 20 minutes of interaction with the patient monthly. However, Relator Harrison's patients were not being contacted at all by CareSync which resulted in a lack of care management.

38. Relator Harrison became aware of CareSync's fraudulent time records when his staff noticed time logged for a patient that had passed away months prior. When Relator Harrison discovered this, his office contacted CareSync to ask about a particular patient. This patient had passed away in February but CareSync had submitted time logs for care management calls to Dr. Harrison's office through May. That meant that CareSync had logged time that they had contacted the patient and managed their chronic care even though the patient passed away three months prior.

39. CareSync routinely recorded time in the database as being unable to reach the patient but logging that time under CPT code 99040 for their failure to contact the patient. Even though CareSync was unable to reach the patient and perform the monthly check-in, they were registering the unsuccessful phone calls as taking anywhere from twenty (20) minutes to over one hundred (100) minutes.

40. Each patient in CareSync's database has a full twenty minutes logged. CareSync is representing that they are performing their duty under the requirements of CPT Code 99490; however, the Medicare requirements were not intended for the twenty minute requirement to be satisfied by an unsuccessful phone call.

41. Because CareSync submits time for each patient in their database, Relator Harrison's office pulled the time records. The office staff found that for the time period they reviewed, only six (6) out of ninety-six (96) calls were successful.

42. As indicia of reliability, Relator provides the following examples of CareSync's time records showing time recorded for unsuccessful calls to patients in 2016:

- CareSync recorded three unsuccessful phone calls for patient R.B.: June—Unsuccessful at 63 minutes; July—Unsuccessful at 46 minutes; and August—Unsuccessful at 67 minutes.

- CareSync recorded three unsuccessful phone calls for patient W.M.: June—Unsuccessful at 43 minutes; July—Unsuccessful at 33 minutes; and August—Unsuccessful at 30 minutes.

- CareSync recorded three unsuccessful phone calls for patient C.P.: June—Unsuccessful at 101 minutes; July—Unsuccessful at 33 minutes; and August—Unsuccessful at 44 minutes.

- CareSync recorded three unsuccessful phone calls for patient D.M.: June—Unsuccessful at 53 minutes; July—Unsuccessful at 20 minutes; and August—Unsuccessful at 33 minutes.

43. Though these calls were logged as unsuccessful, there were no other attempts made by CareSync to contact the patient another day or later in the month. Therefore, the patient was without care management for months at a time.

44. Once the time is logged by CareSync, Relator Harrison and his staff were expected to submit that time to Medicare for billing. This time details the minutes of chronic care management and lists the category of time. It is clear by the time records reviewed and attached that CareSync is attempting to satisfy the time requirement of CPT Code 99490 with time logged for uploading and transcribing records.

45. CareSync is causing the submission of false claims to Medicare through their fraudulent

time record submissions to Relator Harrrison's office. CPT Code 99490 allows $42 to be submitted to Medicare for payment per patient each month for the management of that patient's care. Relator Harrison's office receives $9 of that payment. In turn, CareSync bills Relator Harrison's office $25 for each patient, each month.

46. As indicia of reliability, Relator provides the following examples showing CareSync's fraudulent time submissions that caused the submission of false claims for payment to Medicare and are also examples of false records or statements used to support a false claim:

Patient T.A. #1 is an example of a patient that has been enrolled in chronic care management through CareSync from January 2016 through September 2016. For January 2016, claims for a total of 53 minutes of CCM was caused to be submitted to Medicare. Of those 53 minutes, the record shows that the time consisted of: uploading records, CCM New Member, a two minute CCM Monthly Follow Up, a two minute Provider Contact, twenty minutes to upload records, seventeen minutes to transcribe records, and another two minutes for transcribing records. CareSync's records document that the monthly follow-up phone call was only a maximum of two minutes.

Patient T.A. #2 is another patient (same initials) that was enrolled in chronic care management through CareSync. T.A. #2's January 2016 Time History does not show a monthly call being made. Instead, the total of twenty-nine minutes was caused to be submitted to Medicare and the records show four minutes to upload records, two minutes for provider contact, and twenty-three minutes to upload records. The majority of the time billed for January was for CareSync uploading records to the account instead of getting in touch with the patient and managing their care.

Patient M.M. was enrolled in chronic care management through CareSync in January 2016.

11

M.M. had a total of forty-five minutes that was caused to be submitted to Medicare for CCM in January 2016 but was not contacted for her monthly follow-up call that month. The minutes consisted of provider contact, uploading records, and transcribing records. CareSync caused Medicare 5o billed for time to manage the patient's care without actually talking to the patient at all. This is not the type of care that is required by Medicare.

Patient M.R. was enrolled in chronic care management through CareSync from January 2016 through April 11, 2016. Twenty-eight minutes of care management was caused to be submitted to Medicare in January 2016, but CareSync did not contact M.R. to follow-up on her care during that time. Instead, the time recorded was for a minute of provider contact and for transcribing and uploading records.

Patient M.W. was enrolled in chronic care management with CareSync. Twenty-six minutes of care management was caused to be submitted to Medicare in January 2016. All but two minutes of this time was recorded as uploading records. The remaining two minutes were recorded as provider contact. Of the twenty-six minutes recorded on the first month of enrollment through Dr. Harrison's office, this patient was not contacted by CareSync.

Patient P.G. was enrolled in chronic care management through CareSync. In May 2016, Caresync caused claims for time to be submitted to Medicare for managing P.G.'s care at 74 minutes. However, the notes from the call show that the call was unsuccessful and that the "phone just kept on ringing."

Patient V.T. was enrolled in chronic care management through CareSync. CareSync logged in their notes that they did not have the correct number for V.T., but they continued to log time and attempt their phone call each month. In October 2016, CareSync logged that the

number had been disconnected but still listed twenty minutes spent managing V.T.'s care. Exhibit 18. In July, forty-four minutes was logged for making a call to V.T. to a disconnected number and mailing out a letter. Caresync cause false claims for this time to be submitted to Medicare.

47.     Based on the example records above, CareSync is billing for pulling patient records and reviewing those in preparation for the monthly phone call, but the monthly phone call is unsuccessful. CareSync may attempt to make one call to the patient, but when there is no patient contact, the records show that CareSync does not try to reach the patient again. CareSync is not providing the care required by CPT code 99490, but represents that it is providing such care.

48.     CareSync is not properly managing the care of Relator Harrison's patients, in fact, they are not managing his patient's care at all. CareSync markets themselves as providing a "snapshot" of each patient's complete medical care; however, they are submitting time and misleading records for these patients and causing false claims to be submitted to the Government for these false records. Once he discovered this, Relator Harrison stopped using CareSync's services and terminated his contract with them. Because CareSync's headquarters are call services are centralized in Tampa, Florida and because CareSync has physician clients all over the Country, Relator believes the fraudulent conduct he experienced from CareSync has been repeated all over the Country causing the submission of hundreds of thousands of false claims for payment to Medicare.

## COUNT I
## FALSE CLAIMS ACT VIOLATION OF 31 U.S.C. § 3729 (a)(1)(A)

49.     Relator hereby incorporates and re-alleges all the preceding paragraphs as if set forth fully herein.

50. Defendant by and through their agents, officers, and employees, knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

51. The United States has been damaged as a result of Defendant's violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by Defendant for false claims submitted to the United States.

52. The United States is entitled to three times the total damages sustained as a result of Defendant's violations.

53. The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendant's false claims.

54. Relator is entitled to reasonable attorney's fees and cost pursuant to 31 U.S.C. §3730(d)(1).

## COUNT II
## FALSE CLAIMS ACT VIOLATION OF 31 U.S.C. § 3729 (a)(1)(B)

55. Relator hereby incorporates and hereby re-alleges all of the preceding paragraphs as if fully set forth herein.

56. Defendant by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. §3729 (a)(1)(B).

57. The United States has been damaged as a result of Defendant's violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by Defendant for false claims submitted to the United States.

58. The United States is entitled to three times the total of damages sustained as a result of

Defendant's violations of 31 U.S.C. §3729(a)(1)(B).

59.     The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

60.     The Relator is entitled to reasonable attorney's fees and cost pursuant to 31 U.S.C. §3730(d)(1).

**PRAYER FOR RELIEF**

WHEREFORE, Relator prays for judgment

(a)     Ordering Defendant to pay the United States Government three times its actual damages resulting from the Defendant's violations of the False Claims Act;

(b)     Ordering Defendant to pay the United States Government a civil penalty for each false claim as set forth in the False Claims Act;

(c)     Awarding Relator an amount the Court decides is reasonable for collecting the civil penalty and monetary damages by pursuing this matter, which award, by statute shall not be less than 15% nor more than 25% of the proceeds of this action or the settlement of any such claim, if the Government intervenes in the action and not less than 25% nor more than 30% if the Government declines to intervene in the action.

(d)     Ordering Defendant to pay Relator's attorney's fees and costs;

(e)     Granting such other relief as the Court may deem just and proper.

**RELATOR HEREBY DEMANDS TRIAL BY STRUCK JURY.**

Dated: October 4, 2017.

Respectfully Submitted,

_____
James D. Young, Esq. (FL Bar No. 567507)

jyoung@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(813) 318-5169 (Telephone)
(813) 222-4793 (Facsimile)

Don McKenna, Esq. *(Pro Hac Vice to be filed)*
Don@hwnn.com
Randi McCoy, Esq. *(Pro Hac Vice to be filed)*
Randi@hwnn.com
**HARE, WYNN, NEWELL & NEWTON, LLP**
2025 3rd Ave. N, Suite 800
Birmingham, AL 35203
(205)308-1331 Telephone
(205)324-2165 Facsimile

*Attorneys for Relator*